## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

VELMA M. MELTON                          *
1523 HUNT AVENUE
HYATTSVILLE, MD 20785                     *

     *Plaintiff,*                          *

v.                                       *        Civil Action: 8:19-cv-209

SELECT PORTFOLIO                         *
SERVICING,
INC.                                     *
3815 SOUTH WEST TEMPLE
SALT LAKE CITY, UT 84115                 *

     **Serve on:**                       *

     **Select Portfolio Servicing,**     *
     **Inc., c/o**
     **CSC-Lawyers Incorporating**        *
     **Service Company**
     **7 St. Paul Street, Suite 820**     *
     **Baltimore, MD 21202**
                                         *

**and**                                  *

STERLING, INC. dba                       *
JARED-GALLERIA OF
JEWELRY                                  *
113 ½ SOUTH MAIN STREET
AKRON, OH 44308                          *

     **Serve on:**                       *

     **Sterling, Inc., c/o**             *
     **The Corporation Trust, Inc.**
     **2405 York Road, Suite 201**        *
     **Lutherville Timonium, MD**
     **21093**
**and**                                  *

PRESTIGE FINANCIAL                       *
SERVICES, INC.
2405 YORK ROAD, SUITE 201                *
LUTHERVILLE TIMONIUM,
MD 21093                                 *

**Serve on:**       *
**Prestige Financial Service,**
**Inc., c/o**       *
**The Corporation Trust,**
**Incorporated**       *
**2405 York Road**
**Suite 201**       *
**Lutherville Timonium, MD**
**21093**       *

**and**       *

**EXPERIAN INFORMATION**       *
**SOLUTIONS, INC.**
**505 CITY PARKWAY WEST**       *
**ORANGE, CA 92668**
      *

**Serve on:**       *
**Experian Information**       *
**Solutions, Inc. c/o**
**The Corporation Trust,**       *
**Incorporated**
**2405 York Road**       *
**Suite 201**
**Lutherville Timonium, MD**       *
**21093**
      *

**and**       *

**EQUIFAX INFORMATION**       *
**SERVICES, LLC**
**1550 PEACHTREE ST., NW**       *
**ATLANTA, GA 30309**

**Serve on:**       *
**Equifax Information**
**Services, LLC c/o**       *
**CSC-Lawyers Incorporating**
**Service Company**       *
**7 St. Paul St, Suite 820**
**Baltimore, MD 21202**       *

**and**       *

**TRANS UNION, LLC**       *
**555 WEST ADAMS STREET**
**CHICAGO, IL 60661**       *

**Serve on:**                          *
**Trans Union, LLC c/o**
**CSC-Lawyers Incorporating**   *
**Service Company**
**7 St. Paul St, Suite 820**       *
**Baltimore, MD 21202**
                                       *

*Defendants*

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiff, Velma M. Melton, (hereafter the "Plaintiff") by counsel, and her for her complaint against the Defendants, alleges as follows:

## PRELIMINARY STATEMENT

1.     With the digitization of our world Americans have witnessed a revolutionary increase in the accumulation and processing of data of their personal and financial information.  The data revolution has become an integral part of our lives and has benefited us all in countless ways.

2.     As we enjoy the benefits of these technological advances, custodians of this data must remain mindful of the substantial economic and emotional harm that often results when this information is mishandled or misused. Examples of such mishandling include when inaccurate information is disseminated and/or obtained about an American consumer.

3.     Companies commonly known as consumer reporting agencies ("CRAs") have benefited immensely from these advances in the area of data technology allowing them to accumulate and sell American consumers credit histories and personal information.

4.     These CRAs sell to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers and similar interested parties) information, commonly known as "consumer reports." Concerning individuals who may be applying for retail

credit, for the lease of an apartment, for a car or mortgage loan, for employment or the like.

5.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. §1681 et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private and financial information that they compile and sell about individual consumers.

6.     Requiring CRAs to assure the "maximum possible accuracy" of consumer information is crucial to the stability of our banking system to wit:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.     The preservation of one's good name is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage to buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed (emphasis added).

Bryant v. TRW, Inc., 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

8.     To further the primary goal of greater accuracy, the FCRA also requires CRAs, as well as "furnishers" of credit information to the CRAs, among many other duties, to conduct "reasonable investigations" into disputes lodged to CRAs by consumers claiming to have inaccurate or incomplete information appearing to their credit reports, to correct or update any such errors or omissions, and to report back to the consumers the results of their investigations.

9.     This action seeks, compensatory, statutory, and punitive damages, costs and reasonable attorneys' fees for Plaintiff Velma M. Melton against Select Portfolio Servicing, Inc.; Sterling, Inc., dba Jared-Galleria of Jewelry; Prestige Financial Services, Inc.; Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union, LLC for violation of common law and for their willful and/or negligent violations of the Fair Credit Reporting Act, as described herein and asserts additional claims against Select Portfolio Servicing, Inc. and Sterling, Inc. under common law.

## JURISDICTION

10.     The jurisdiction of this Court is conferred by 15 U.S.C. § 1681(p) and 28 U.S.C. § 1367.

## PARTIES

11.     The Plaintiff is a natural person and resident of the State of Maryland. She is a "consumer" as defined by 15 U.S.C. § 1681a(c).

12.     Select Portfolio Services, Inc. (hereafter "SPS") is a corporation incorporated under the laws of the State of Utah and is authorized to do business in the State of Maryland.

13.     Sterling, Inc. dba Jared-Galleria of Jewelry (hereafter "Jared") is a corporation incorporated under the laws of the State of Ohio and is authorized to do business in the State of Maryland.

14.     Prestige Financial Services, Inc. (hereafter "Prestige") is a corporation incorporated under the laws of the State of Utah and is authorized to do business in the State of Maryland.

15.     Experian Information Solutions, Inc. (hereafter "Experian") is a corporation incorporated under the laws of the State of Ohio and is authorized to do business in the State of Maryland.

16.     Equifax Information Services, LLC (hereafter "Equifax") is a private limited company formed under the laws of the State of Georgia and is authorized to do business in the State of Maryland.

17.     Trans Union, LLC (hereafter "Trans Union") is a private limited company formed under the laws of the State of Delaware and is authorized to do business in the State of Maryland.

18.     Experian, Equifax and Trans Union are each a "consumer reporting agency," as defined in 15 U.S.C. § 1681(f). Experian, Equifax and Trans Union are regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681(d) to third parties.

19.     Experian, Equifax and Trans Union disburse such consumer reports to third parties under contract for monetary compensation.

## FACTUAL ALLEGATIONS

20.     Credit-reporting agencies collect information from furnishers like SPS, Jared, Prestige, other creditors, governmental entities, collection agencies and third-party intermediaries. They generally collect data every month, and they typically update their credit records within one to seven days after receiving new information. To facilitate the collection process and to reduce reporting costs, the CRAs have implemented procedures to have data submitted in a standard format, the so-called Metro format. Data may be submitted through various media, including CD-ROM and electronic data transfer. Furnishers like SPS, Jared and Prestige submit information voluntarily. No state or federal law requires them to report data to the CRAs or to use a particular format for their reporting. As a result, the completeness and frequency of reporting by furnishers can vary.

21.     A credit score is a number that summarizes credit risk, based on a snapshot of a consumer's credit report at a particular point in time. Credit bureau based scores have been available since 1989 when Fair Isaac and Company, installed its first "FICO" score at Equifax. Credit scores summarize the information on a consumer's credit report. The score is designed to be predictive of credit risk and is used by lenders and insurance companies. FICO scores, which are the industry standard, are calculated from different credit data variable groups.

22.     Every day thousands of consumer disputes are received and processed by the National CRAs: Equifax, Trans Union and Experian. These disputes are received via phone, mail or online through the Internet. Each credit-reporting agency is obligated by the FCRA to conduct a reasonable investigation of the disputed item(s).

23.     The bureaus and the data furnishers are obligated under the FCRA to ensure that they have reasonable procedures in place to ensure maximum possible accuracy of the credit file data.

24.     When a consumer contacts the credit bureaus, the bureau will typically send an Automated Consumer Dispute Verification form (hereafter "ACDV") electronically through a system called e-Oscar, to the data furnisher for verification of the item in question.

25.     The e-Oscar system was developed by Equifax, Experian, Innovis and Trans Union and purports to be an "Online Solution for Complete and Accurate Reporting."

26.     Upon receiving the ACDV through e-Oscar, the furnisher is required to conduct its own investigation and send a response back to the CRAs. The dispute can be verified as reported, changed/updated or deleted.

27.     The results of the investigation are then updated on the credit report by the CRAs and either mailed or emailed back to the consumer. This process can take up to 30-45 days to complete but it typically takes less than 30.

28.     Either because of time, cost, or volume of disputes, the CRA's have adopted an investigation procedure that involves condensing a consumer's dispute to a 2 to 3 digit code that is sent electronically to the data furnisher. Sometimes, the CRA's also provide images of the actual dispute letter sent by the consumer to the CRAs.

29.     Unfortunately, the data furnisher almost always performs its investigation based only on this 2 or 3 digit code and quickly verifies its previous data to the CRA's without performing any real investigation. In fact, these investigations are often conducted in under three minutes by low level back office employees who are often compensated based upon the number of disputes they can process per day.

30.     The CRAs then rely solely on the results of the data furnisher's investigation without performing any independent investigation.

31.     This investigation method is known as "parroting" and no independent analysis, evaluation or reasonable investigation is ever performed by the CRAs.

32.     SPS, Jared and Prestige are "furnishers" and regularly furnish information about consumers, including the Plaintiff, to CRAs including, Equifax, Experian, Trans Union and Innovis.

33.     Within two years prior to the filing of this lawsuit, Plaintiff repeatedly requested and received copies of the credit file of the Plaintiff compiled and maintained by Equifax, Experian and Trans Union.

34.     Each credit report received by the Plaintiff contained errors and each CRA furnished Plaintiff's credit reports to 3rd party credit granting entities after receiving her disputes.

### a. EXPERIAN INACCURACIES

35.    Two of the most egregious inaccuracies reported by Experian were furnished by SPS and Jared.

36.    The inaccuracy furnished by SPS and reported by Experian was that Plaintiff had an open mortgage loan with a balloon payment of $220, 580.00 due in 2036. This information was inaccurate because Plaintiff satisfied and paid in full this account as part of a sale transaction on or about November 30, 2015.

37.    Plaintiff disputed the SPS inaccuracy with Experian multiple times. Plaintiff's letters disputing this inaccuracy were either mailed or faxed to Experian.

38.    Experian's response to Plaintiff's first and second dispute letter was to simply inform her that the information had been verified as accurate.

39.    Experian's response to Plaintiff's third dispute letter was to actually add a past due balance of $25,806 and total balance owed of $329,928 to the account information included on the report.

40.    Plaintiff disputed the SPS inaccuracy contained in the Experian report directly with SPS multiple times. Plaintiff disputed the SPS inaccuracy in the Experian report directly with SPS via a phone call on December 5, 2018. Plaintiff subsequently disputed the SPS inaccuracy in the Experian report directly with SPS again via email on December 5, 2018. SPS never responded to Plaintiff's phone and email disputes.

41.    SPS failed to correct the egregious inaccuracies it furnished to Experian.

42.    The inaccuracy furnished by Jared in the Experian report was that Plaintiff had an unpaid charge off balance. The information furnished by Jared was inaccurate and

misleading because it did not reflect that Plaintiff paid Jared directly and settled the account for less than the full balance on or about March 29, 2017.

43.    Plaintiff disputed the Jared inaccuracy with Experian multiple times. Two of the letters Plaintiff sent disputing this inaccuracy were sent in June 2017 and November 2018.

44.    Experian's response to all three of Plaintiff's disputes regarding the Jared inaccuracy was to simply inform her that the information had been verified as accurate.

45.    Upon the Plaintiff's request for verification and correction of the SPS and Jared inaccuracies, and in accordance with their standard procedures, Experian did not evaluate or consider any of Plaintiff's information, claims or evidence and did not make any attempt to substantially or reasonably investigate the disputed inaccuracies.

46.    It is alleged that that Experian failed to contact SPS and Jared. Alternatively, it is also alleged that Experian did forward some notice of the disputes to SPS and Jared and both SPS and Jared failed to conduct their own lawful investigations.

47.    The SPS and Jared inaccuracies are damaging and derogatory items on the Plaintiff's Experian credit report.

### b. EQUIFAX INACCURACIES

48.    Two of the most egregious inaccuracies reported by Equifax were furnished by Jared and Prestige.

49.    The inaccuracy furnished by Jared and reported by Equifax was that Plaintiff had an unpaid charge off balance. The information furnished by Jared was inaccurate and misleading because it did not reflect that Plaintiff paid Jared directly and settled the account for less than the full balance on or about March 29, 2017.

50.     Plaintiff disputed the Jared inaccuracy with Equifax multiple times. Two of the letters Plaintiff sent disputing this inaccuracy were sent in  June 2017 and November 2018.

51.     Equifax's response to Plaintiff's first and second dispute of the Jared inaccuracy was to simply inform her that the information had been verified as accurate.

52.     Equifax simply did not respond to Plaintiff's most recent dispute of the Jared inaccuracy.

53.     The inaccuracy furnished by Prestige and reported by Equifax was that Plaintiff had two delinquent Prestige accounts. This was inaccurate because Plaintiff only ever had one account with Prestige. The second account was an inaccurate duplicate.

54.     Plaintiff disputed the Prestige inaccuracy with Equifax multiple times. The most recent dispute was mailed to Equifax in November 2018.

55.     Equifax simply did not respond to Plaintiff's most recent dispute of the Prestige inaccuracy.

56.     Upon the Plaintiff's request for verification and correction of the Jared and Prestige inaccuracies, and in accordance with its standard procedures, Equifax did not evaluate or consider any of Plaintiff's information, claims or evidence and did not make any attempt to substantially, or reasonably verify the Jared and Prestige disputed inaccuracies.

57.     It is alleged that Equifax failed to contact Jared and Prestige. Alternatively, it is also alleged that Equifax did forward some notice of the disputes to Jared and Prestige and both Jared and Prestige failed to conduct their own lawful investigations.

58.     The Jared and Prestige inaccuracies are damaging and derogatory items on the Plaintiff's Equifax credit report.

### c. TRANS UNION INNACURACY

59.     The most egregious inaccuracy reported by Trans Union was furnished by Jared.

60.     The inaccuracy furnished by Jared and reported by Trans Union was that Plaintiff had an unpaid charge off balance. The information furnished by Jared was inaccurate and misleading because it did not reflect that Plaintiff paid Jared directly and settled the account for less than the full balance on or about March 29, 2017.

61.     Plaintiff disputed the Jared inaccuracy with Trans Union multiple times. Two of the letters Plaintiff sent disputing this inaccuracy were sent in June 2017 and November 2018.

62.     Trans Union's response to all of Plaintiff's disputes of the Jared inaccuracy was to simply inform her that the information had been verified as accurate.

63.     Upon the Plaintiff's request for verification and correction of the Jared inaccuracy, and in accordance with its standard procedures, Trans Union did not evaluate or consider any of Plaintiff's information, claims or evidence and did not make any attempt to substantially, or reasonably verify the Jared disputed inaccuracy.

64.     In the alternative to the allegation that Trans Union failed to contact Jared, it is alleged that Trans Union did forward some notice of the disputes to Jared and Jared failed to conduct its own lawful investigation.

65.     The Jared inaccuracy is a damaging and derogatory item on the Plaintiff's Trans Union credit report.

## COUNT I
## VIOLATION OF 15 U.S.C. § 1681e(b) BY EXPERIAN, EQUIFAX and TRANS UNION

66.     The Plaintiff realleges and incorporates paragraphs 1 through 65 above as if sully set out herein.

67.     A "consumer reporting agency" is defined by the FCRA as follows:

> any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

*See* 15 U.S.C. § 1681a(f).

68.     Experian, Equifax and Trans Union are each a consumer reporting agency as defined by Section 1681a(f) of the FCRA.

69.     Section 1681n of the FCRA imposes civil liability on any CRA "who willfully fails to comply with any requirement" of the Act. *See* 15 U.S.C. § 1681n(a). Any person who willfully fails to comply with any requirement of the FCRA is liable to the consumer for actual damages, statutory damages, punitive damages, costs of the action, and reasonable attorneys' fees. *Id*. at § 1681n(a)(1)-(3).

70.     Section 1681*o* of the FCRA provides for civil liability against any CRA which is negligent in failing to comply with any requirement imposed under the Act. See 15 U.S.C. § 1681o. Any person who negligently fails to comply with any requirement of the FCRA is liable to the consumer for actual damages, costs of the action, and reasonable attorneys' fees. Id. at § 1681o(a)(1)-(2).

71.     The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." See 15 U.S.C. § 1681e(b).

72.     When Experian, Equifax and Trans Union receive a dispute from a consumer, their "investigation" procedure involves little more than condensing the consumer's dispute to a two-digit code that gets transmitted electronically to the furnisher of the disputed information for comparison with the furnisher's own information.

73.     Experian, Equifax and Trans Union do no independent or further "investigation" of the substance of the consumer's dispute.

74.     This method of investigation is known as "parroting" of information, and has been rejected routinely by courts throughout the country.

75.     Making matters worse, Experian, Equifax and Trans Union have a policy and/or procedure not to investigate a dispute lodged by a consumer if the subject of the dispute has been "investigated" by them previously. In other words, upon receipt of a consumer's dispute, Experian, Equifax and Trans Union first step is to check whether the subject of the dispute has previously been "investigated," *i.e.*, whether a two-digit code has previously been sent to the furnisher of the information to check whether the data matches. If it has, Experian, Equifax and Trans Union often refuse to do any sort of investigation into the consumer's dispute whatsoever.

76.     A procedure aimed at the expeditious elimination of work for Experian, Equifax and Trans Union instead of the accuracy of the underlying information is patently unreasonable or runs an unjustifiably high risk of violating the FCRA § 1681i.

77.     Moreover, the FCRA envisions the investigation process to involve both the CRA ***and*** the furnisher of the information. With two (2) separate entities involved, both

of whom have distinct responsibilities to conduct a reasonable investigation, *see* 15 U.S.C. § 1681i and § 1681s-2b, the consumer has greater protection that inaccurate information will be corrected as quickly as possible.

78.    Because of the repeat dispute procedure, the consumer loses that protection. Experian, Equifax and Trans Union unilaterally determine that the furnisher of the disputed information will not even be contacted to conduct its own investigation.

79.    While the FCRA allows a consumer to pursue a cause of action against a furnisher who fails to conduct a reasonable investigation of a consumer's dispute, the furnisher ***must*** receive notification from the CRA, not the consumer, as a pre-requisite to the cause of action. *See* 15 U.S.C. § 1681s-2b.

80.    As described above, Experian, Equifax and Trans Union willfully and/or negligently failed to follow reasonable procedures to assure maximum possible accuracy of the information they circulated about Plaintiff.

81.    As a direct and proximate result of the failures of Equifax, Experian and Trans Union, Plaintiff has suffered economic and non-economic loss in specific amounts to be proved at trial.

82.    As a direct and proximate result of the failures of Experian, Equifax and Trans Union, Plaintiff has suffered a significant loss of trust in the credit reporting system and its accountability to the average consumer.

83.    As a direct and proximate result of the willful and/or negligent refusal of Experian, Equifax and Trans Union to adopt and/or follow reasonable procedures as mandated by the FCRA, Plaintiff has suffered loss and damage including, but not limited to, financial loss, lost credit opportunity, expenditure of time and resources, ***risk to her security clearance*** and mental anguish, entitling her to an award of actual damages in

amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15. U.S.C. § 1681o.

84.     The continued refusal of Experian, Equifax and Trans Union to adopt and/or allow reasonable procedures as mandated by the FCRA reveals a conscious disregard of the rights of the Plaintiff. The injuries suffered by the Plaintiff are attended by circumstances of fraud, malice, and willful and wanton misconduct entitling the Plaintiff to statutory damages, punitive damages, attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(2).

85.     Experian, Equifax and Trans Union violated 15 U.S.C § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files they published and maintain concerning the Plaintiff.

## COUNT II
## VIOLATION OF 15 U.S.C. § 1681i BY EXPERIAN, EQUIFAX and TRANS UNION

86.     Plaintiff realleges and incorporates paragraphs 1 though 85 above as if fully set out herein.

87.     The FCRA mandates that a CRA conduct a investigation of the accuracy of the information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposes a 30-day time limitation for the completion of such an investigation. *Id.*

88.     The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is, in fact, inaccurate, or is unable to verify the accuracy of the disputed information, the consumer reporting agency is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

89.     The FCRA allows a CRA to terminate an investigation "if the agency reasonably determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information." *See* 15 U.S.C. § 1681i(a)(3)(A). However, the FCRA mandates that "[u]pon making any determination in accordance with subparagraph (A) that a dispute is frivolous or irrelevant, a consumer reporting agency shall notify the consumer of such determination not later than 5 business days after making such determination." See 15 U.S.C. § 1681i(a)(3)(B).

90.     Experian, Equifax and Trans Union violated 15 U.S.C § 1681i by failing to delete inaccurate information in the Plaintiff's credit file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant information to the appropriate furnisher by failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

91.     Experian, Equifax and Trans Union willfully and/negligently failed to conduct *any* investigation, let alone a reasonable investigation, of Plaintiff's dispute in violation of 15 U.S.C. § 1681i(a)(1).

92.     Upon information and belief, at no point in their reviews of Plaintiff's dispute did Experian, Equifax and Trans Union make a determination that the dispute was frivolous or irrelevant.

93.     Experian, Equifax and Trans Union certainly did not advise the Plaintiff that the Plaintiff's dispute had been determined to be frivolous or irrelevant as expressly required by 15 U.S.C. § 1681i(a)(3)(B).

94. As a direct and proximate result of the refusal to conduct a reasonable investigation by Experian, Equifax and Trans Union, Plaintiff has suffered economic and noneconomic loss.

95. As a direct and proximate result of the disregard by Experian, Equifax and Trans Union for Plaintiff's disputes and the importance of the Plaintiff's good name and credit rating, Plaintiff has suffered a significant loss of trust in the credit reporting system and its accountability to the average consumer.

96. As a direct and proximate result of the willful and/or negligent refusal by Experian, Equifax and Trans Union to conduct a reasonable investigation as mandated by the FCRA and as outlined above, Plaintiff has suffered other loss and damage including, but not limited to, financial loss, expenditure of time and resources, mental anguish, humiliation, embarrassment and emotional distress, entitling her to an award of actual damages in amounts to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681o.

97. The continued refusal by Experian, Equifax and Trans Union to adopt and/or follow reasonable procedures as mandated by the FCRA reveals a conscious disregard of the rights of the Plaintiff. The injuries suffered by the Plaintiff is attended by circumstances of fraud, malice, and willful and wanton misconduct entitling Plaintiff to statutory damages, punitive damages, attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(2).

## COUNT III
## VIOLATION OF 15 U.S.C. § 1681s-2(b) BY SPS, JARED and PRESTIGE

98. Plaintiff realleges and incorporates paragraphs 1 through 97 above as if fully set out herein.

99. SPS violated the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b) by continuing to report the patently inaccurate SPS representation to Experian; by failing to

fully and properly investigate the Plaintiff's dispute of the SPS representation described above; by failing to review all relevant information regarding the same; by failing to accurately respond to Experian; and by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the SPS representations to Experian.

100.    Jared violated the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b) by continuing to report the patently inaccurate Jared representation to Experian, Equifax and Trans Union; by failing to fully and properly investigate the Plaintiff's dispute of the Jared representation described above; by failing to review all relevant information regarding the same; by failing to accurately respond to Experian, Equifax and Trans Union; and by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the Jared representations to Experian, Equifax and Trans Union.

101.    Prestige violated the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b) by continuing to report the inaccurate and misleading duplicate Prestige account to Equifax; by failing to fully and properly investigate the Plaintiff's dispute of the duplicate Prestige representation described above; by failing to review all relevant information regarding the same; by failing to accurately respond to Equifax; and by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the duplicate Prestige account to Equifax.

102.    As a direct and proximate result of this conduct, action and inaction of SPS, Jared and Prestige, Plaintiff has suffered loss and damage including, but not limited to, financial loss, expenditure of time and resources, mental anguish, humiliation, embarrassment and emotional distress, entitling her to an award of actual damages in amounts to be proved at trial.

103.    The conduct, action and inaction of SPS, Jared and Prestige was willful, rendering SPS, Jared and Prestige liable for actual or statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, SPS, Jared and Prestige were negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. § 16810.

104.    The Plaintiff is entitled to recover costs and attorneys' fees from SPS, Jared and Prestige in an amount to be determined by the Court pursuant to 15. U.S.C. § 1681n and § 16810.

<u>**COUNT IV**</u>
<u>**DEFAMATION BY SPS**</u>

105.    Plaintiff realleges and incorporates paragraphs 1 through 104 above as if fully set out herein.

106.    As part of a sale transaction on or about November 30, 2015, SPS received a full payment on the account they continued to report as open and with an outstanding delinquent balance as recently as November 29, 2018.

107.    Not only did SPS accept the $364,042.63 payment but they subsequently issued a Certificate of Satisfaction or Release of Lien against the property further demonstrating they were fully aware that the account had been satisfied.

108.    Additionally, SPS was notified on at least **four (4)** additional occasions that the information they were reporting to Experian was egregiously inaccurate. These notifications were provided to SPS in May of 2017, November of 2018 and twice in December 2018. Plaintiff notified SPS of the inaccuracy via certified mail, phone and email.

109.    Not only did SPS fail to correct its reporting but it made matters worse by increasing the inaccurate balance of $220,580.00 to $329,928.00.

110.     Notwithstanding that it had actual knowledge of the inaccuracies, SPS falsely represented to Experian that the SPS representation was true when it was in fact false and misleading.

111.     Within one year of the filing of this Complaint SPS published false and misleading information claim that Plaintiff had an open mortgage account with a delinquent balance owed to SPS.

112.     The defamation was willful and with malice. SPS had actual knowledge that the Plaintiff was not legally responsible to pay any amount for the account reported in the SPS representation because it issued a Certificate of Satisfaction or Release of Lien for the subject mortgage account. SPS's issuance of a Certificate of Satisfaction or Release of Lien clearly demonstrates SPS had actual knowledge that it received the full payment of the loan balance.

113.     SPS also had substantial evidence by which to have verified that the SPS representation about the mortgage account was not accurate. SPS willfully decided to ignore the settlement document that was emailed to and confirmed received by SPS which confirm the mortgage account had been satisfied. Specifically, no one form SPS ever reviewed the documents attached to the email sent to them on December 5, 2018.

114.     As a direct and proximate result of this conduct, action and inaction of SPS, Plaintiff has suffered loss and damage including, but not limited to, financial loss, expenditure of time and resources, mental anguish, humiliation, embarrassment and emotional distress, entitling her to an award of actual damages in amounts to be proved at trial.

115.     The defamation, conduct and actions of SPS were willful, deliberate, intentional and/or with reckless disregard for the interests and rights of Plaintiff such as

to justify an award of punitive damages against SPS in an amount to be determined by the Court.

WHEREFORE, Plaintiff, Velma M. Melton, respectfully prays for a judgment against Defendants as follows:

      a.      Actual damages sustained in an amount in excess of $75,000.00 and statutory damages of not less than $100 and not more than $1,000 for violations of the FCRA;

      b.      Such amount of punitive damages as the Court may allow for violations of the FCRA;

      c.      The cost of the action together with reasonable attorneys' fees as determined by the Cout;

      d.      Such other and further relief as may be just and proper.

### JURY TRIAL DEMAND

Velma M. Melton hereby demands a jury trial by jury on all issues in this action, except for any issues relating to the amount of statutory damages, attorney's fees and litigation costs.

Dated: January 22, 2019           Respectfully Submitted,

                   /s/ Kevin C. Williams

                   Kevin C. Williams, Esq., No. 18072
                   Law Office of Kevin Williams, LLC
                   8025 13th Street, Suite 107
                   Silver Spring, MD 20910
                   301.399.1700
                   titlelaw@gmail.com